CUNNINGHAM v. SHEA et al.

(Supreme Court, Appellate Division, Fourth Department. March 7, 1906.)

1. FALSE IMPRISONMENT—CIVIL LIABILITY—EXERCISE OF AUTHORITY.

Where the rules of a county house provided for the infliction of punishment on any inmate using profane language, the engineers employed therein were not guilty of false imprisonment in placing an inmate in a room designed for the confinement of refractory inmates, because of his having used profane language in the engine room.

2. SAME—EXTENT·OF RESTRAINT.
　　The engineers were not liable for the confinement of the inmate after the keeper of the county house had been notified thereof, and had directed that it continue.

3. SAME—EVIDENCE—ADMISSIBILITY.
　　It was error not to permit the engineers to· show the instructions which had been given them by the keeper relative to the care of inmates, and the enforcement of the rules pertaining to their conduct.
　　McLennan, P. J., dissenting.

Appeal from Trial Term, Onondaga County.

Action by Patrick Cunningham against John Shea and another. From a judgment in favor of plaintiff, defendants appeal. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS. NASH, and KRUSE, JJ.

Ernest L. Edgcomb, for appellants.

Frank C. Sargent, for respondent.

SPRING, J. The plaintiff was an inmate of the county house of Onondaga county. The defendants were engineers regularly employed therein. The plaintiff, according to the testimony on behalf of the defendants, was using profane and obscene language in the engine room on the premises, and threatened to run a knife into the defendant Shea. The defendants thereupon placed the plaintiff in a room designed for the confinement of refractory inmates, where he was detained during the day. The action is for false imprisonment and the defendants justified their apprehension of the plaintiff by alleging that at the time they confined him he was violating the rules and regulations of the institution designed for the government of the inmates, and was causing a disturbance.

Upon the trial the court several times stated and charged the jury that the transaction was merely a personal altercation between the defendants and the plaintiff, and the fact that he was an occupant of the county house and that the defendants while employed therein confined him for a violation of the rules mentioned and for improper conduct, were not to be considered by the jury. The rules referred to were offered in evidence. It was conceded that they had been properly published and proven, but they were excluded on the ground that they afforded no justification for the confinement of the plaintiff in this room. We think the exclusion of this evidence was reversible error. Section 10 of the rules, which are contained in the case, provides:

"Punishment will be inflicted on all those who are guilty of drunkenness, disorderly conduct, profane or obscene language, theft, waste of food, or any other waste whatever."

In the succeeding section the keeper is directed "to promptly inflict the most exemplary punishment" for a "willful violation" of the rules. The imposition of severe punishment is intrusted to the keeper. We apprehend, however, that if one of the inmates is swearing boisterously, or attempting to jab one of the other lodgers with a knife, an employe may take him into custody, and place him in the room intended for unruly inmates, and report the occurrence to the keeper, who

then assumes responsibility, and determines what shall be done. This confinement is not an imprisonment. The inmate all the time is in the custody of those in charge of the county house, amenable to its rules and regulations, and the temporary deprivation of his liberty in the manner stated may be essential to the preservation of order and to the maintenance of discipline. This confinement of the plaintiff does not involve any question of the delegation or transmission of authority from the superintendent or keeper to the defendants. They took the plaintiff into custody for the purpose of preventing him from doing bodily harm, and to check him in the open, flagrant violation of the rules of the institution and from committing violence, and their intervention at the time of the transgression was followed by a prompt report of the transaction to the keeper, who had seen them taking him to the cell or room for confinement.

The defendants endeavored to show what they reported to the keeper, and that the keeper then directed them to keep the plaintiff in the cell. This evidence was also excluded and its exclusion was material error. The keeper, upon being informed of the confinement of the plaintiff in the cell, assumed to decide as to his continued custody. That official was in authority, and responsible for the retention of the plaintiff, not the defendants. If they had desired to release him they could not have done so in the face of the explicit instruction by the keeper that he should be left in confinement. The keeper knew where he was confined, the reason for it, and approved of it by ordering that it be continued. The damages were not limited to the act of placing and leaving the plaintiff in the cell, but extended to the deprivation of his freedom for the entire day, although the keeper and not the defendants, was responsible for this continued incarceration. Again the court erred in refusing to permit the defendants to show the instructions which had been given to them by the keeper relative to the care of inmates, and the enforcement of the rules pertaining to their conduct. If this evidence had been received, we assume it would have established that the defendants were keeping within the exact scope of their directions in their treatment of the plaintiff. The evidence would further have tended to show that while these defendants were employed as engineers they were also charged with the duty of looking after the inmates, and confining them in the cell, if engaged in violating the rules or any improper conduct, and would have exonerated them from the charge of interfering without any authority.

The counsel for the plaintiff, in order to prevent the reception of these instructions, withdrew any claim of actual malice or for punitive damages. The competency of the proof was not limited to that subject. It was proper to explain the reason for the intervention of the defendants. The disclaimer of actual malice exculpated the defendants from any accusation of confining the plaintiff because of personal pique or ill feeling, and to a large degree eliminated the question of an altercation between the individuals, and which in the charge was made the gravamen of the action. If the rule adopted in this case is to prevail, there will be no safety in any person connected with a charitable institution attempting to interfere with an unruly inmate, except

the keeper or superintendent. If both of these functionaries happen to be absent from the premises, a riot might occur, and the assistants could not put any of the participants in a room in order to quell the disturbance without undergoing the risk of an action for damages and with meager opportunity to justify their interference. In every instance it would be termed a personal altercation between the rioting inmate and the attendant. If the latter is making an arrest within the ordinary signification of that term, he must take the offender before a magistrate or peace officer without unreasonable delay. Code Cr. Proc. § 185; Tobin v. Bell, 73 App. Div. 41, 76 N. Y. Supp. 425. We ought not to dignify this confinement of the plaintiff by calling it an arrest within the meaning of the section of the Criminal Code mentioned. Such a construction is unreasonable, and would be subversive to the discipline and order necessary to the successful management of the institution.

The plaintiff directed his obscene and profane language to the defendants. It is urged that for this reason the affair was with the defendants personally and involved no interference with the order or discipline of the institution. The indecent conduct was committed on the premises. To justify his apprehension it was not necessary that all the inmates be collected to listen to the unseemly language of the plaintiff. He cannot be relieved from the effect of his misconduct on that pretext. Had the keeper confined the plaintiff for the precise violation for which the defendants placed him in the cell, no one would claim the keeper would be liable to the plaintiff in damages. Authorities are cited in the dissenting opinion holding that where a body is vested with the authority to perform certain acts involving judgment and discretion there can be no delegation of the power. For instance a board of excise charged with such duties may not delegate their performance. Board of Excise v. Sackrider, 35 N. Y. 154. So a common council may not commit to another a public duty intrusted to it. Birdsall v. Clark, 73 N. Y. 73, 29 Am. Rep. 105. And where a board of assessors were required by the city charter to act jointly, they may not confer the duty upon one member of the board. Providence Retreat v. City of Buffalo, 29 App. Div. 160, 51 N. Y. Supp. 654.

These authorities have no application to the case we are considering. The maintenance of discipline is essential to the successful management of the institution. A room is provided for the temporary lodgment of intractable inmates. Certain of the employés or attendants are directed to confine in this room any inmate openly engaged in disturbing the peace or guilty of misbehavior and promptly to report to the keeper or official in charge. This rule or mode of operating the institution is no infraction of the principle upon which the authorities cited rest. The character of the institution and the necessity for the preservation of order require that others aside from the keeper, who may not always be present, be given authority to act in the limited way in which these defendants did in this case. Judgment and order should be reversed, and a new trial granted, with costs to the appellants to abide the event.

Judgment and order reversed, and new trial granted, with costs to the appellants to abide the event. All concur, except McLENNAN, P. J., who dissents in an opinion.

McLENNAN, P. J. I cannot concur in the proposition enunciated in the prevailing opinion, that a common laborer employed in one of the county houses of the state may imprison and restrain of his liberty an inmate, for using profane or obscene language directed to such laborer especially when such language is not used in the presence of other inmates, or under such circumstances as to create a disturbance or interfere with the general discipline of such institution, or that such imprisonment may be justified by a previous verbal delegation of authority by the keeper or superintendent of such institution to such laborer, or that a subsequent ratification or approval of such imprisonment for such cause by the keeper, made in the absence of the inmate, and without giving him an opportunity to be heard, will in any manner relieve the laborer from full liability for all the consequences of such imprisonment if originally wrongful.

This action was brought to recover the damages sustained by the plaintiff, alleged to have been caused by reason of his unlawful imprisonment by the defendants. During the progress of the trial plaintiff's counsel waived any claim for punitive or exemplary damages. The jury rendered a verdict in favor of the plaintiff for only $65, which presumably is the amount of actual damages sustained by him. At least it is not claimed upon this appeal that the verdict is excessive. The plaintiff, who was the only witness sworn in his behalf, testified, in substance, that he was an inmate of the county house of Onondaga county and had been for upwards of two years; that he was 67 years of age; had been a cripple for eight years previous, and practically incapacitated from doing any manual labor; that at the time in question, the defendant Crysler was employed as engineer, and that the defendant Shea was his assistant or helper, both being common laborers, and having no official responsibility for the government or management of the institution so far as is disclosed by any adopted or published rules of the institution, or by any law of the state.

The plaintiff testified that at about 7 o'clock on the morning of the 21st day of September, 1904, in seeking to take care of certain garbage, as he was instructed to do, he went to the engine room where the defendants were engaged, for the purpose of putting said garbage in the furnace to be consumed; that when he entered, there being no other inmates present, he charged the defendant Shea with having stolen a bag of nuts which belonged to him; that thereupon such defendant, without any other cause or provocation, called the defendant Crysler, determined that the plaintiff should be locked up, and thereupon they forcibly placed him in a cell, and there kept him all day, practically without anything to eat or drink; they, the defendants, saying to him at intervals that if he would retract the statement that Shea had stolen his bag of nuts, which he refused to do, they, the defendants, would release him from imprisonment.

The defendants' version of the transaction is, in substance, that when the plaintiff came to the engine room and charged the defendant Shea with having stolen the nuts in question, he (Shea) denied the charge: that thereupon the plaintiff called Shea "a damned liar," "a son of a bitch," and used other profane and obscene language; that the plaintiff drew or attempted to draw a knife from his pocket, threatening at the same time to do bodily harm to the defendant Shea; that thereupon he (Shea) called to Crysler; that they were afraid bodily harm would be done them by the plaintiff, and for that reason they determined to confine the plaintiff in a cell, which they did, and kept him there for practically 12 hours, but frequently stated to him that if he would retract the charge, which he had made as to the stealing of the nuts, or would promise to refrain from using violence, as threatened, he would be discharged from imprisonment; that the plaintiff refused to so retract or promise, but after about 12 hours of imprisonment he was released.

The learned trial court charged the jury that:

"The detention was a wrong on the part of the defendants unless, because of the threats or actions of the plaintiff they, as reasonable men, believed, and had a right to believe, that they were in danger of bodily harm or injury unless the plaintiff was detained. In that event, and in that event only, they had the right to detain the plaintiff until they could reasonably obtain a warrant or obtain his arrest in some legal or proper way."

The jury found that the defendants had no just cause to apprehend bodily harm from the old, crippled plaintiff, and so rendered a verdict in his favor for $65, and from the judgment entered thereon this appeal is taken.

We think it is elementary that if the plaintiff's version of the transaction is correct, or even if as claimed by the defendants he used profane and obscene language, they were not justified in punishing him by imprisonment for such alleged offense; the words and conduct of the plaintiff, if we eliminate his alleged threats, which it is claimed caused the defendants to apprehend bodily harm would be done them, all of which are eliminated by the verdict of the jury, in no manner tended to create a disturbance or a breach of the peace, and did not interfere with any rule of discipline with the enforcement of which the defendants were concerned or for which they were responsible. They were employed solely for the purpose of looking after the conduct of the engines and boilers, and not of the inmates of the institution, and it can hardly be claimed that by reason of their right to perform the first duty they had the power to assume the responsibility involved in the discharge of the latter. A father may punish his child for a failure to obey his commands or other misconduct, but it has never been held that the hired man may inflict punishment for such causes without becoming liable to the infant therefor; and so, notwithstanding the father may have authorized such action. A warden of a prison or his deputy, a superintendent of an asylum or his subordinates, duly authorized in that regard, may summarily restrain the inmates of their liberty for the violation of the rules and regulations of such institutions, but we venture the suggestion that it has never before

been held that the hired man or hired girl, the assistant engineer, or other common laborer in such an institution, may assume to punish an inmate for the violation of a rule, where such violation does not tend to disturb the peace of the institution, the safety or comfort of the other inmates, and was not of such character as to occasion fear of bodily harm to the employé, who assumed to so act in the premises. If we keep in mind the fact that the question of defendants' fear of bodily harm has been eliminated by the verdict of tne jury, the case at bar is a most forceful illustration of what the adoption of the rule contended for by the appellants would lead to. With that eliminated the version of the transaction as claimed by the appellants is that the plaintiff found the defendant Shea alone, and charged him with having stolen some nuts, which for aught we know was true; Shea, however, denied the charge, and the plaintiff told him he lied; which, of course, he did, if the charge of theft was well founded. The discussion became more heated, and the plaintiff told Shea that he was something worse than a liar; which latter charge we may assume was incapable of proof. Shea then called to his assistance another hired man, the defendant Crysler, and then concluded to summarily and effectively end the controversy by restraining the plaintiff of his liberty, and by way of punishing him for having dared to charge the hired man with stealing nuts, being a liar and other things, all of which perhaps were true, they prescribed bread and water as a diet for the plaintiff during his confinement. The extent of such confinement, I suppose, was determined by the rules applicable to "indeterminate sentences," or more probably to the sweet will of the imprisoners. At all events, by reason of the summary action of the defendants in the premises, we shall never know whether the charges made by the plaintiff against Shea were true or false.

Seriously, it seems to me that the right of personal liberty, even of a pauper in a county house, is too sacred to permit of its destruction in such fashion or by any such pretense. The right of personal liberty is universal, save only as it is subject to such exceptions as are necessary for the common welfare of society. At common law, a private citizen without warrant might lawfully seize and detain another in certain cases. It is justifiable to hold a man to restrain him from mischief; it is lawful to interfere in a fray which endangers the lives of the combatants. Under the right of self-defense it is lawful to seize and restrain any person incapable of controlling his own actions, whose being at large endangers the safety of others, but such action under these exceptions is only justifiable when the urgency of the case demands immediate intervention. The right to exercise this summary remedy has its foundation in a reasonable necessity and ceases with the necessity. A dangerous maniac may be restrained temporarily, but only until he can be safely released or can be arrested upon legal process or committed to the asylum under legal authority, and a person although insane, if not dangerous, may not thus be arrested and restrained. The right of personal liberty is too sacred to be left to the determination of an individual not charged with any duty in the premises. The imprisonment or restraint of the plaintiff in the case

at bar does not come within any of the exceptions alluded to or to which our attention has been called. As found by the jury, he was not dangerous, he was creating no disturbance in the presence of the other inmates, he was simply engaged in a wordy altercation with the defendant Shea; only themselves being present. The defendants, as we have seen, were not charged with any duty with respect to the management of the institution or with the enforcement of any rules relating to its government or discipline, and we therefore conclude that the defendants had no right or authority to imprison and restrain the plaintiff of his liberty for any cause suggested by the evidence other than the alleged fear of bodily harm, which was eliminated by the verdict of the jury.

It is urged in the prevailing opinion that certain exceptions present reversible error. It seems to me they are all disposed of by the proposition, if correct, that the imprisonment of the plaintiff by the defendants was wholly unjustifiable, because the alleged offense was not of such a character as to justify summary punishment in any event, or such as to authorize action in the premises by the defendants. However, the questions presented by such exceptions will be considered. The defendants offered in evidence certain printed rules and regulations for the government of the Onondaga county poor house, which presumably had been prepared by the superintendent of the poor and approved by the county judge of Onondaga county on the 1st day of January, 1871. Such rules were excluded, an exception duly taken, and it is urged that their exclusion was error. It will be assumed that such rules were authorized by law and approved in accordance therewith, although it is evident that chapter 225, p. 136 of the Laws of 1896, being passed 25 years after the adoption of such rules, could not in any manner add to their force or effect. We think an examination of the rules offered, which are contained in the record, clearly shows that they had no relevancy to any issue involved in this case. It is only claimed by appellants' counsel that rules 10 and 11 are pertinent. Those are as follows:

"10. Punishment will be inflicted on all those who are guilty of drunkenness, disorderly conduct, profane or obscene language, theft, waste of food, or any other waste whatever.

"11. The keeper will be vigilant in detecting every negligent or willful violation of these rules, and will promptly inflict the most exemplary punishment; and in all cases of solitary confinement for criminal conduct, the persons diet shall consist solely of bread and water; while those who conduct well, will receive kind treatment and every reasonable indulgence."

There is nothing in either of these rules which would authorize an employé at the county house to inflict punishment on any inmate who is guilty of the use of "profane or obscene language." Rule 11 provides:

"The keeper will be vigilant in detecting every violation of these rules, and will inflict the most exemplary punishment. * * * "

Nowhere in such rule is it suggested that the engineer, assistant engineer, or any other employé may inflict punishment upon the inmates of such institution because of their use of "profane or obscene language."

Number 1 of such rules provides:

"At the ringing of the bell in the morning every person, the sick excepted. must rise from their beds, dress and repair to the place for washing, there wash themselves, and then immediately commence the work assigned them by the keeper or matron."

It will hardly be claimed that if one of the inmates neglected to rise from his or her bed, that the hired man or hired girl could imprison such inmates for a violation of such rule. There being nothing in the rules excluded by the learned court which 'had any bearing upon any issue involved upon the trial, or which would authorize the defendants to imprison the plaintiff because he directed "profane or obscene language" to them, their exclusion was not error. Again, it is suggested that it was error to exclude the evidence offered by the defendants to the effect that, after they had imprisoned the plaintiff, they reported the facts and circumstances to the keeper, and that he approved of their action in the premises, and directed that the imprisonment of the plaintiff be continued. If the imprisonment of the plaintiff by the defendants was originally illegal, any ratification or approval of their acts by the keeper could not make it legal or lawful or relieve them from all the consequences of their wrongful act. Mandeville v. Guernsey, 51 Barb. 99.

In writing the opinion in that case the late Justice James C. Smith said:

"A person who has arrested a party without process, or on void process, wrongfully, cannot detain him on valid process, until he has restored such party to the condition he was in at the time of his arrest, at least to his liberty."

The reason and justice of the rule thus enunciated is fully illustrated in this case. If we assume that the keeper had, in his discretion, the authority to imprison the plaintiff because of his use of "profane or obscene language," it by no means follows that such punishment would have been imposed if he had first acted in the premises, had seen the plaintiff, and had heard his story. We think it will not do for the defendants to say that upon their ex parte statement, and without hearing the plaintiff, the keeper ratified their action, and that now they claim immunity from the consequences of their acts because of such ratification. Under the rule suggested by Judge Smith, it was at least their duty to have released the plaintiff, and then have permitted the keeper to determine whther or not the plaintiff deserved punishment, and what the punishment should be. No case has been called to our attention in which it has been held that a person who has unlawfully imprisoned another may shield himself 'from the consequences of such unlawful act by asserting that after the imprisonment took place his conduct in that regard was approved by some one who would have had, in the first instance, authority to have caused such imprisonment, such pretended approval being given in the absence of the imprisoned person, and without any opportunity on his part to be heard. Again, it is urged that the learned trial court committed reversible error in refusing to permit the defendants to prove that previously they had been verbally authorized by the keeper to punish inmates of the institution for

an infraction of the rules, as applicable to this case, for using profane and obscene language. As already indicated, we think no such delegation of authority by the keeper to imprison or to punish could lawfully be made, and that it did not in any manner relieve the defendants from the consequences of their illegal acts. No question of punitive or exemplary damages is involved. We are only concerned in ascertaining whether or not the plaintiff's imprisonment was illegal. If it was, he is entitled to the actual damages sustained thereby.

We conclude that no verbal delegation of authority by the keeper to the defendants would justify them in imprisoning the plaintiff under the circumstances disclosed by the evidence, and that, therefore, the trial court properly excluded the evidence offered to establish the delegation of such authority. The rule which was offered in evidence specifically states that the keeper shall inflict the punishment. No right is conferred upon him by such rule to delegate his authority in any respect. The rule requires the exercise of his judgment and discretion in inflicting punishment upon the poor confined in his institution, and consequently he cannot delegate his authority by substituting the judgment and discretion of an engineer or fireman in inflicting punishment upon the inmates confined in the institution, even as to the future government of the inmates in matters where the institution is interested. Providence Retreat v. City of Buffalo, 29 App. Div. 160, 51 N. Y. Supp. 654; Powell v. Tuttle, 3 N. Y. 396; Commissioners of Excise v. Sackrider, 35 N. Y. 154; Birdsall v. Clark, 73 N. Y. 73, 29 Am. Rep. 105; Burke v. Burpo, 75 Hun, 568, 27 N. Y. Supp. 684.

The facts in this case are simple. If the plaintiff's version of the transaction is true, no one would claim his imprisonment could be justified, no matter what authority had been delegated by the keeper to the defendants, or whether or not their acts in the premises had been ratified. The claim made by the defendants that they were afraid and had reasonable cause to fear that bodily harm would be done them by the plaintiff has been eliminated by the verdict of the jury. It therefore only remains to determine whether an inmate of a county house may be restrained of his liberty by a common laborer, because such inmate uses profane and obscene language to such laborer in a personal altercation, not in the presence of other inmates, even if verbally authorized so to do by the keeper of such institution, or whether or not such laborer may thus illegally imprison and escape full liability for the consequences of such imprisonment, because the keeper may see fit to ratify such illegal and wrongful act.

We are constrained to hold that the learned trial court submitted the issues of fact in this case to the jury upon the correct theory, and that his rulings upon the admission and rejection of evidence were absolutely correct, and that the judgment and order appealed from should be affirmed.